UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORGE ALMANZAR, on behalf of himself and all others similarly situated, | No.  2:20–cv–0699–KJN |
| Plaintiff, | ORDER ON MOTION FOR PROVISIONAL CERTIFICATION AND PRELIMINARY APPROVAL OF CLASS ACTION & PAGA SETTLEMENT |
| v. | |
| HOME DEPOT U.S.A., INC., | (ECF Nos. 18, 21.) |
| Defendant. | |

Presently pending before the court is plaintiff Jorge Almanzar's unopposed motion for (i) provisional certification of a settlement class and (ii) preliminary approval of a class action and PAGA settlement in this wage-and-hour labor dispute.  (ECF No. 18.)  The assigned district judge took the motion under submission without a hearing.  (ECF No. 20.)  After filing a subsequent request for ruling (ECF No. 21), the parties consented to the jurisdiction of a magistrate judge for all purposes, 28 U.S.C. § 636(a), and the case was reassigned to the undersigned.  (See ECF Nos. 23, 24, 25.)

For the following reasons, the court GRANTS provisional certification of the settlement class and DENIES preliminary approval of the settlement, without prejudice to renewal.

///

///

1

1  **I.      BACKGROUND**

2      **A.   Factual and Procedural History**

3          Plaintiff worked for defendant Home Depot from June 2018 to April 2020 as a non-

4  exempt, hourly-paid Night Team Merchandising Execution Associate ("Night Team MEA").

5  (ECF No. 18.2, Declaration of David R. Markham ("Markham Decl.") ¶¶ 2-3; see also ECF

6  No. 18.2 at 73.)  Night Team MEAs' job duties included stocking and merchandising products at

7  Home Depot's stores.  (Markham Decl. ¶ 2.)  Plaintiff worked 10-hour shifts four days a week,

8  with three to four shifts per week spent traveling between Home Depot stores.  (Id. ¶ 3.)

9          On April 3, 2020, plaintiff filed this putative class action against Home Depot on behalf of

10  himself and other similarly situated current and former Night Team MEAs.  (ECF No. 1.)  Shortly

11  thereafter, plaintiff filed a First Amended Complaint.  (ECF No. 6.)  Home Depot answered on

12  August 18, 2020 (ECF No. 8), and the parties engaged in private mediation.  On August 4, 2021,

13  the parties reached a settlement in principle and executed a Memorandum of Understanding.

14  (ECF No. 15; see ECF No. 18.1 at 10.)  On October 21, 2021, plaintiff filed the instant motion for

15  provisional class certification and preliminary settlement approval.  (ECF No. 18.)

16          Attached to the instant motion, in furtherance of the settlement, is a Second Amended

17  Complaint ("SAC") encompassing all claims to be released; the parties stipulate to plaintiff's

18  filing of the SAC for settlement purposes without a need for defendant to answer.[1]  (Markham

19  Decl., Ex. 1(D) ("SAC"); see id. Ex. 1 ("Settlement Agreement") § II, ¶ 1.)  In the SAC, plaintiff

20  alleges causes of action for:  (1) failure to provide compliant meal periods, in violation of

21  California Industrial Welfare Commission ("IWC") Wage Orders and California Labor Code

22  §§ 226.7(b) and 512; (2) failure to provide compliant rest periods, in violation of IWC Orders and

23  Labor Code § 226.7(b); (3) failure to pay regular and overtime wages for all time worked, in

24  violation of IWC Orders and Labor Code §§ 510, 1194, and 1198; (4) failure to reimburse

25  ―――――――――――――

26  [1]  Because the court is denying preliminary approval without prejudice, the court will not direct
that the SAC be formally filed at this time—in case plaintiff wishes to alter its contents in light of

27  this order before bringing any renewed motion for preliminary approval.  Nevertheless, the court
evaluates plaintiff's current motion by treating the SAC as the operative complaint for purposes

28  of settlement.

necessarily incurred business expenses, in violation of Labor Code § 2802; (5) failure to timely pay all wages due upon termination, in violation of Labor Code §§ 201-203; (6) failure to furnish timely and accurate wage statements, in violation of Labor Code § 226; (7) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17208, through the above conduct; and (8) penalties under the Private Attorneys General Act ("PAGA"), Cal. Lab. Code §§ 2698 - 2699, for the above Labor Code violations.  (SAC at 11-22.)  As part of the First and Second Causes of Action, plaintiff seeks to recover the one-hour premium required by Labor Code § 226.7(c) for each workday in which he did not receive compliant meal and rest periods.  (SAC ¶¶ 39-40, 46-49.)

Plaintiff's first four causes of action are direct claims, while the final four claims are derivative in that they stem from the underlying alleged failures to provide compliant meal and rest periods, to pay for all time worked, and to reimburse business expenses.  In support of the direct claims, plaintiff alleges that Night Team MEAs' meal and rest breaks were often interrupted, either by in-person requests or by work-related calls to their personal cell phones (SAC ¶ 14); they received late meal breaks due to difficulty finding a manager to let them out of the stores, which were kept locked at night (id. ¶ 12); they were unlawfully told that they could not take their second 30-minute meal breaks required by California law (id. ¶ 13); their commuting time traveling between stores (averaging 30 minutes) was compensated only at the regular rate, instead of the overtime rate, even though that commute time was on top of their regular 10-hour shifts (id. ¶ 15); Home Depot maintained an unlawful policy of rounding their shift end-time to the nearest 15-minute mark (id. ¶ 16); they were required to use their personal vehicles to travel between stores but were reimbursed at less than the standard IRS rate for that mileage (id. ¶ 17); and they were not reimbursed for cell phone expenses incurred when contacted on their personal devices with work-related tasks and questions (id. ¶ 18).

**B.  Negotiation and Settlement Terms**

After this action was filed, the parties engaged in discovery.  (ECF No. 18.1 at 9; Markham Decl. ¶ 7.)  Before mediation, plaintiff's counsel reviewed employment records and defendant's policies and handbooks regarding meal and rest breaks, timekeeping, travel time, and

3

business expenses; and plaintiff's expert analyzed a 20% class sample of time and payroll records and prepared a damages model.  (Id.)  The parties carefully investigated the facts, claims, and legal principles going into the mediation session.  (Id. ¶ 8.)

On August 4, 2021, the parties participated in private mediation with Louis Marlin, Esq., whom plaintiff describes as an experienced mediator.  (ECF No. 18.1 at 10; Markham Decl. ¶ 9.) At the conclusion of the mediation session, the parties reached a settlement in principle and executed a Memorandum of Understanding.  (Id.)  After several weeks of further arm's length negotiations, the parties finalized the terms of the settlement agreement that is now before the court for preliminary approval.  (ECF No. 18.2 at 20-125, Ex. 1 ("Settlement Agreement"); see Markham Decl. ¶ 9; ECF No. 18.1 at 10.)

The Settlement Agreement contains a release of all claims asserted in the SAC against Home Depot by the proposed class, defined as:

> [A]ll persons who are employed or have been employed by HOME DEPOT USA, INC. in California as a non-exempt, hourly Night Team Merchandising Execution Associate during the CLASS PERIOD [that is, the period from April 3, 2016 to the earlier of the Preliminary Approval Date, or November 1, 2021].

(Settlement Agreement § I, ¶¶ 5-6, 29.)  The proposed class consists of approximately 1,992 class members, including 732 individuals who separated from Home Depot during the class period. (Markham Decl. ¶¶ 11-12.)

In return for the release of claims, the Settlement Agreement provides for a non-reversionary gross settlement amount of $750,000.  (Settlement Agreement § I, ¶ 17.)  This amount is based on plaintiff's expert's estimation that there were 97,121 compensable workweeks/50,761 pay periods during the class period; that class members averaged 3.6 shifts per week and 9.5 hours per shift; and that the average hourly rates were $13.51 for regular time and $20.27 for overtime.  (Id. § III, ¶ 30; Markham Decl. ¶¶ 11-12.)

The Settlement Agreement proposes deducting from the $750,000 gross settlement amount the following:

(a)  Class representative incentive award of $15,000;

(b)  Class counsel's attorney's fees of $250,000;

  (c) Class counsel's litigation costs of $30,000;

  (d) Settlement administrator costs of $14,250; and

  (e) A PAGA payment of $28,125 to be paid to the Labor Workforce and Development Agency ("LWDA"), out of an overall PAGA award of $37,500.[2]

(Settlement Agreement § III, ¶ 15.)

  The above deductions would yield a Net Settlement Fund of $412,625.  (Id.)  As proposed, the Net Settlement Fund would be distributed across all class members who do not opt out of the settlement, on a pro-rata basis determined by the number of workweeks they worked as class members during the class period.  (Id. § III, ¶¶ 11, 16-17.)  Without accounting for the length of each class member's employment, plaintiff's counsel estimates that the proposed settlement would result in "an approximate recovery of over $200 per class member."[3] (Markham Decl. ¶ 30.)

  The Settlement Agreement allows 45 days from the mailing of the proposed Notice of Class Action Settlement ("Class Notice") for class members to (a) request to be excluded from the settlement (that is, "opt out"), (b) object to the terms of the settlement, or (c) dispute their dates of employment and estimated recovery amount listed on the Notice.  (Settlement Agreement § I, ¶¶ 21, 32; id. § III, ¶ 9.)  Those who do not opt out within that time become "Participating Class Members" and will ultimately receive their settlement payments by check.  (Id. § I, ¶ 24; id. § III ¶¶ 16, 18, 19.)  Those who do opt out will not receive any payment.  (Id. § III, ¶ 11.)

  The Settlement Agreement provides no mechanism for distributing the 25% employee-designated PAGA payment to those who opt out of the class settlement; nor does the proposed Class Notice convey to class members that even if they opt out, they will still be bound by the

---

[2] As discussed below, PAGA requires that 75% of PAGA penalties recovered go to the LWDA and 25% to the aggrieved employees.  Cal. Lab. Code § 2699(i).  Accordingly, the Settlement Agreement dictates that the remaining $9,375 (25% of $37,500) will be paid to the Net Settlement Fund. (Settlement Agreement § III, ¶¶ 15, 26.)

[3] Plaintiff does not explain the underlying calculation, but this average recovery appears to be calculated by the following equation:  $412,625 (Net Settlement Fund) / 1,992 class members = $207.14.

judgment as to the PAGA penalties claim being settled in this action. This fundamental issue is one of several problems that lead the court to deny preliminary approval of the settlement—while granting the request for provisional class certification.

**II.    DISCUSSION**

In the instant motion, plaintiff seeks an order (1) provisionally certifying the settlement class and appointing plaintiff as a class representative and plaintiff's counsel as class counsel; (2) preliminarily approving the proposed settlement; (3) approving the form and content of the Class Notice; (4) directing that Class Notice be given to Class Members; (5) preliminarily approving the chosen settlement administrator; and (6) scheduling a fairness hearing. (ECF No. 18.1 at 8.)

When parties seek approval of a class settlement before class certification, courts must analyze "both the propriety of the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003); see Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval."). Accordingly, the court considers:  (1) whether the proposed class meets the certification requirements, and (2) whether the proposed settlement is "fundamentally fair, adequate, and reasonable." Staton, 327 F.3d at 952. At the preliminary approval stage, the court considers the likelihood that it will ultimately approve the proposed settlement. Fed. R. Civ. P. 23(e)(1)(B).

Although this action largely consists of class claims, it also includes a claim for penalties under the California Labor Code's Private Attorneys General Act ("PAGA"). Importantly, this PAGA claim is not a class claim. See Kim v. Reins Int'l Cal., Inc., 9 Cal. 5th 73, 87 (2020) ("[A] representative action under PAGA is not a class action[,]" but rather a "representative action on behalf of the state." (quotations omitted)); see also Canela v. Costco Wholesale Corp., 971 F.3d 845, 855 (9th Cir. 2020) (discussing Kim's holding). This is true because "[p]laintiffs may bring a PAGA claim only as the state's designated proxy, suing on behalf of all affected employees." Kim, 9 Cal. 5th at 87 (emphases original); see Viking River Cruises, Inc. v. Moriana, 142 S. Ct. 1906, 1914 (2022) (explaining how California law characterizes PAGA as creating a "type of qui

6

tam action" with the representative private plaintiff acting in place of the government (quoting Iskanian v. CLS Transp. Los Angeles, LLC, 59 Cal. 4th 348, 382 (2014)).  Because a PAGA claim "is not [ ] a collection of individual claims for relief" like a class action, Kim, 9 Cal. 5th at 86; Canela, 971 F.3d at 855-56, PAGA claims "need not satisfy Rule 23 class certification requirements," Hamilton v. Wal-Mart Stores, Inc., --- F.4th ----, No. 19-56161, 2022 WL 2350262, at *5 (9th Cir. June 30, 2022).  However, like class action settlements, settlements of PAGA claims must be approved by the court.  Cal. Lab. Code § 2699(*l*)(2).  The court applies "a Rule 23-like standard" asking whether the settlement of the PAGA claims is "fundamentally fair, reasonable, and adequate."  Haralson v. U.S. Aviation Servs. Corp., 383 F. Supp. 3d 959, 972 (N.D. Cal. 2019).

Therefore, motions to preliminarily approve class action settlements that also contain PAGA claims are best approached in three parts.  First, the court examines whether the class claims (the non-PAGA causes of action) satisfy the requirements for certification under Rule 23. Then, in evaluating whether to preliminarily approve the overall settlement, the court considers, second, the adequacy of the agreement as to the class claims under Rule 23(e) and, third, the adequacy of the agreement as to the PAGA claims.

Here, the court concludes that the class should be certified (for purposes of settlement), but that the proposed settlement is not adequate to preliminarily approve as to either the Rule 23 claims or the PAGA claims.  Accordingly, the motion is granted in part and denied in part, without prejudice to renewal.

## A. Provisional Class Certification under Rule 23

To be certified, a putative class must satisfy both Rule 23(a) and fit within the three Rule 23(b) subdivisions.  Leyva v. Medline Indus. Inc., 716 F.3d 510, 512 (9th Cir. 2013). Rule 23(a) establishes four prerequisites for class certification:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  Fed. R. Civ. P. 23(a).  If these threshold requirements are met, the class must also satisfy one of the three options under Rule 23(b).  Here, plaintiff invokes Rule 23(b)(3), which provides that a class action may be maintained only if "questions of law or fact common to class members predominate over any questions affecting

only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

To reiterate, plaintiff seeks provisional certification of a class defined as "all persons who are employed or have been employed by [defendant] in California as a non-exempt, hourly Night Team Merchandising Execution Associate" during the class period.  (Settlement Agreement § I, ¶ 5; ECF No. 18.1 at 20.)

### 1. *Numerosity*

For class certification, the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The numerosity requirement demands "examination of the specific facts of each case and imposes no absolute limitations."  Gen. Tel. Co. of Nw., Inc. v. EEOC, 446 U.S. 318, 330 (1980).  Courts have found the requirement satisfied when the class comprises as few as 39 members or where joining all class members would serve only to impose financial burdens and clog the court's docket.  See Murillo v. Pac. Gas & Elec. Co., 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity and listing cases).  Plaintiff estimates that there are approximately 1,992 members in the putative class.  (ECF No. 18.1 at 20.)  Joinder of this number of plaintiffs is clearly impractical, and courts have certified classes with far fewer members.  See, e.g., Jordan v. Cty. of Los Angeles, 669 F.2d 1311, 1319, n.10 (9th Cir. 1982) (stating inclination to find numerosity satisfied for class of fewer than 100 members).  Thus, plaintiff satisfies the numerosity requirement.

### 2. *Commonality*

Second, there must be "questions of law or fact common to the class" to be certified.  Fed. R. Civ. P. 23(a)(2).  To satisfy commonality, the class representative must demonstrate that the litigation will "depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  "So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)."  Wang v. Chinese Daily News, Inc., 737 F.3d 538, 544 (9th Cir. 2013) (cleaned up).

1        Here, plaintiff contends there are six common questions of law and fact:

2

      (i)        Whether or not Class Members were paid for all hours
3                    worked and were provided with meal and rest breaks; (ii)
Whether or not Class Members were paid meal break
4                    premiums at a correct regular rate of pay; (iii) Whether or not
Class Members were reimbursed for all business expenses,
5                    including mileage at the correct rate and for the use of
personal cell phones for work-related tasks; (iv) Whether or
6                    not Class Members were provided with all wages due and
owing upon termination and/or separation under Labor Code
7                    section 203; (v) Whether or not Class Members were
provided with accurate wage statements as required by Labor
8                    Code section 226; and (vi) Whether or not Home Depot
engaged in unfair business practices affecting Class Members
9                    in violation of the UCL.

10  (ECF No. 18.1 at 20-21; <u>see</u> SAC at 8-9.)

11        With one caveat, the court agrees that the SAC's claims are all premised on policies that

12  applied to all class members equally, given that all class members were (at one point during the

13  class period) non-exempt hourly employees at Home Depot stores.  The exception lies in the Fifth

14  Cause of Action asserting "waiting time penalties" for failure to timely pay all wages owed upon

15  termination.  (SAC at 17-18.)  <u>See</u> Cal. Lab. Code §§ 201-203 (establishing sanction of up to 30-

16  days' wages for employers who "willfully fail[ ] to pay" full amounts due at separation).  This

17  cause of action can only be asserted by the 732 class members who actually left employment with

18  Home Depot during the class period; therefore, it is not common to all 1,992 class members.

19  While this might pose certain fairness problems in terms of approving the settlement (discussed

20  below), it does not destroy commonality because many other common questions apply to the full

21  class.  <u>See</u> <u>Wang</u>, 737 F.3d at 544.

22        Because most of the above questions would form the basis of each class member's claims,

23  plaintiff satisfies the commonality requirement.  <u>See</u> <u>Jimenez v. Allstate Ins. Co.</u>, 765 F.3d 1161,

24  1165–66 (9th Cir. 2014) (finding commonality satisfied when class action claims raised common

25  question of whether the employer had a practice or unofficial policy of requiring putative class

26  members to work unpaid overtime).  "Even if individual members of the class will be entitled to

27  different amounts of damages because, for instance, they were denied fewer meal and rest breaks

28

than other employees or had their time rounded down less often than other employees, 'the presence of individual damages cannot, by itself, defeat class certification.'" Mejia v. Walgreen Co., 2020 WL 6887749, at *4 (E.D. Cal. Nov. 24, 2020) (quoting Leyva, 716 F.3d at 513, and finding commonality satisfied).

### 3. Typicality

The third certification requirement, typicality, is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality test asks "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Sali v. Corona Reg'l Med. Ctr., 909 F.3d 996, 1006 (9th Cir. 2018) (internal quotation omitted). The typicality requirement is a permissive standard: "[class] representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998).

Here, plaintiff's claims are typical of the class because he was a non-exempt, hourly-paid Night Team MEA employed by Home Depot and was subject to the same practices and policies regarding timekeeping, travel time, business expense reimbursements, and meal and rest breaks as other class members. (ECF No. 18.4 ("Almanzar Decl.") ¶¶ 3, 5-10; SAC ¶¶ 8, 24, 29.) Although it is not totally clear from the motion, it appears that the named plaintiff, himself, separated from employment with Home Depot in April 2020, which is within the class period spanning from April 2016 to November 2021. (See Almanzar Decl. ¶ 3, stating "I worked for Defendant . . . from approximately June 2018 to April 2020 . . . ."). Thus, plaintiff's claims are substantially identical to the those of the other 732 former employees, and at least reasonably co-extensive with the other 1,260 employees who remained employed by Home Depot through the end of the class period. The typicality requirement is satisfied.

### 4. Adequacy of Representation

To satisfy Rule 23(a)'s final requirement, the representative parties must be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). When analyzing the

adequacy of the representation the court must address two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1031 (9th Cir. 2012) (citation omitted).  Certification will be denied in instances of "actual fraud, overreaching, or collusion." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 948 (9th Cir. 2011) (emphasis in original).

  i.  Conflicts of Interest

Based on plaintiff's declaration, it does not appear that he has any interests that conflict with the class other than the proposed incentive award.  (Settlement Agreement at 17; Almanzar Decl. ¶¶ 12-22.)  See Staton, 327 F.3d at 975-76 (discussing conflicting interests for named plaintiff receiving incentive award).  Incentive awards, which are "fairly typical in class action cases," are meant to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958-59 (9th Cir. 2009).  Nevertheless, courts "must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . ." Radcliffe v. Experian Info. Solutions, Inc., 715 F.3d 1157, 1164 (9th Cir. 2013).  In assessing the reasonableness of incentive awards, the court considers "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions" and "the amount of time and effort the plaintiff expended in pursuing the litigation." Staton, 327 F.3d at 977 (citation omitted).  The court must balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." Id.

The Settlement Agreement proposes a $15,000 incentive award for the sole named plaintiff in this action, Mr. Almanzar.  (ECF No. 18.1 at 20; Settlement Agreement § III, ¶¶ 15, 21.)  This is a startling 2% of the gross settlement amount of $750,000.  (See Markham Decl. ¶ 30.)  Incentive awards equaling even 1% of a gross settlement are "unusually high," Ontiveros v. Zamora, 303 F.R.D. 356, 365 (E.D. Cal. 2014), and are generally found excessive unless the

case involves a much larger settlement amount than this one.  See Sandoval v. Tharaldson Emp. Mgmt., Inc., 2010 WL 248346, at *10 (C.D. Cal. June 15, 2010) (collecting cases and concluding that incentive award of 1% of settlement fund was excessive); Bellinghausen v. Tractor Supply Co., 306 F.R.D. 245, 267 (N.D. Cal. 2015) (citing cases demonstrating that incentive awards typically range from $2,000 to $10,000 and citing cases awarding greater amounts for multi-million-dollar settlements); id. at 268 (awarding reduced incentive award of $10,000 for $1 million settlement, based on plaintiff's significant time and effort expended and personal detriment).

A $15,000 incentive award is also about 70 times larger than the average $200 recovery expected for each unnamed class member.[4]  See McDonald v. CP OpCo, LLC, 2019 WL 2088421, at *8 (N.D. Cal. May 13, 2019) (finding $15,000 incentive award outsized at 7.5 times the recovery of average class member, and instead awarding $10,000 incentive award).

With the exception of Ross v. U.S. Bank, 2010 WL 3833922 (N.D. Cal. Sept. 29, 2010), all of the cases plaintiff cites in support of a $15,000 incentive award involved multi-million-dollar settlements such that the $15,000 awards were an order of magnitude less than the percentage plaintiff seeks here.  (ECF No. 18.1 at 30-31.)  See Ridgeway v. Wal-Mart Stores Inc., 269 F. Supp. 3d 975, 1002 (N.D. Cal. 2017) (awarding $15,000 for each of 9 plaintiffs, which combined for 0.22% of $60 million settlement); Low v. Trump Univ., LLC, 246 F. Supp. 3d 1295, 1299 (S.D. Cal. 2017) (awarding $15,000 for each of 5 plaintiffs, which combined for 0.3% of $25 million settlement); Ontiveros, 303 F.R.D. at 365 (awarding $15,000 for 0.8% of $2 million settlement based on 271 hours the named plaintiff spent assisting the litigation over 6 years).  Ross provides little explanation for finding a $20,000 incentive award appropriate for each of the four named plaintiffs there, beyond noting that those plaintiffs each had their depositions taken and actively attended in-person the mediation that led to the settlement.  Ross,

---

[4]  Because each class member's recovery is currently set to be determined based on the number of weeks worked, some class members would recover significantly more than this average amount.  However, plaintiff's current motion does not provide the highest estimated recovery for any single class member.  **Any renewed motion for preliminary approval of the settlement shall calculate the expected lowest, highest, and median recoveries for individual class members.**

2010 WL 3833922 at *2.  By contrast, plaintiff here mentions no deposition appearances and attests that he was "on a telephonic standby" for the full-day mediation.  (Almanzar Decl. ¶¶ 15-16.)  Moreover, although the aggregate $80,000 award in Ross equaled 2% of the $3.5 million settlement, each individual $20,000 award came to just 0.6% of the settlement amount.

Accordingly, plaintiff will have a steep hill to climb to convince the court to ultimately award the full $15,000 incentive award requested.  The court remains open to the possibility that, in seeking final approval of the settlement, plaintiff may be able to show that he spent significant amounts of time assisting with the litigation of this case—or faced other risks and hardships not borne by unnamed class members—to justify this unusually high incentive award.

For purposes of provisional certification of the class, the court does not find the proposed incentive award so disproportionate that it necessarily creates a conflict of interest and renders plaintiff an inadequate representative.  However, if plaintiff should ultimately seek such a high-percentage incentive award at the final approval stage, he will be required to submit additional evidence documenting his time and effort spent on this case—or other personal risks or sacrifices—to ensure that his additional compensation above other class members is justified.  See Radcliffe, 715 F.3d at 1164 (requiring close scrutiny of incentive awards).  The court will retain discretion to award less than the requested $15,000 at the final approval stage if it finds that such an award is not warranted by plaintiff's future submission.[5]

ii.  Vigorous Prosecution

As to the second aspect of the adequacy inquiry, plaintiff's attorneys at the Markham Law Firm have extensive experience in litigating complex class action cases, including settling wage and hour class actions across the country.  (Markham Decl. ¶¶ 42-51.)  This experience suggests that plaintiff's counsel are well positioned to effectively advocate for the proposed class.  In the

---

[5]  Plaintiff represents that he will file an application for attorneys' fees, costs, and the incentive award at least 14 days before the due date for objections from class members.  (ECF No. 18.1 at 15 n.2.)  See In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988, 993-95 (9th Cir. 2010) (class members must have opportunity to review and object to class counsel's fee motion).  As provided in the Settlement Agreement, any amount of the incentive award not granted by the court will return to the common fund and be distributed to participating class members.  Settlement Agreement § III, ¶ 21.

1  absence of any conflicts of interest between counsel and the class members (id. ¶ 52), there is

2  every reason to believe plaintiff's counsel will continue to prosecute this lawsuit vigorously.

3       Having found all four Rule 23(a) criteria satisfied, the court proceeds to Rule 23(b)(3).

4       ***5.  Rule 23(b)(3) Requirements***

5       Rule 23(b)(3) requires a finding "that the questions of law or fact common to class

6  members predominate over any questions affecting only individual members, and that a class

7  action is superior to other available methods for fairly and efficiently adjudicating the

8  controversy." Fed. R. Civ. P. 23(b)(3).  The test of Rule 23(b)(3) is "far more demanding" than

9  that of Rule 23(a).  Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir.

10  2010) (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)).  First,

11  predominance tests "whether proposed classes are sufficiently cohesive to warrant adjudication

12  by representation." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (quoting

13  Amchem, 521 U.S. at 623).  Second, a class settlement is superior to other available methods

14  where the class mechanism will reduce litigation costs and promote greater efficiency.  Amchem,

15  521 U.S. at 620.  In a class action settlement, the court need not address whether the case, if tried,

16  would present issues of manageability under Rule 23(b)(3)(D).  Id.

17       Here, common questions of law and fact predominate over questions affecting individual

18  members because plaintiff contends that he and all class members were subject to the same

19  policies and practices regarding timekeeping, travel-time compensation, meal and rest breaks, and

20  business expense reimbursements.  When a class action challenges a defendant's uniform

21  policies, courts generally find the predominance requirement satisfied.  See, e.g., Palacios v.

22  Penny Newman Grain, Inc., 2015 WL 4078135, at *5-6 (E.D. Cal. July 6, 2015; Vaquero v.

23  Ashley Furniture Indus., Inc., 824 F.3d 1150, 1154-55 (9th Cir. 2016) (upholding predominance

24  determination in wage and hour suit despite need for individualized damages calculations).

25       Because the court would determine Home Depot's liability based on a review of its

26  uniform policies and practices, concentrating litigation of the issues in one lawsuit would be the

27  most efficient.  See Amchem, 521 U.S. at 620.  Further, when class members' individual

28  recoveries would be relatively modest, the class members' individual interests generally favor

1    certification rather than individual prosecution.  <u>Zinser v. Accufix Res. Inst., Inc.</u>, 253 F.3d 1180,

2    1190 (9th Cir. 2001); <u>see</u> Fed. R. Civ. Pro. 23(b)(3)(A) (one factor in superiority determination is

3    class members' interests in bringing separate actions); <u>Amchem</u>, 521 U.S. at 617 (Rule 23(b)(3)

4    serves to "vindicat[e] . . . the rights of groups of people who individually would be without

5    effective strength to bring their opponents into court at all.").  Finally, plaintiff represents that,

6    although other class actions are pending against Home Depot in other jurisdictions, this is the

7    only action the parties are aware of that is brought exclusively on behalf of the Night Team

8    MEAs.  (ECF No. 18.1 at 23.)  Therefore, this is not just "one more action" adding to a pile of

9    similar litigation and increasing the risk of inconsistent judgments.  <u>Zinser</u>, 253 F.3d at 1191; <u>see</u>

10   Fed. R. Civ. Pro. 23(b)(3)(B) (superiority determination also considers "extent and nature of any

11   litigation concerning the controversy already begun by or against class members").[6]  Thus,

12   common questions predominate, and a class action is a superior vehicle for adjudicating the

13   dispute.

14         In sum, because the court finds Rule 23(a)'s and Rule 23(b)(3)'s requirements are met, it

15   provisionally certifies the class for settlement purposes.

16   **B.   Appointment of Class Counsel & Class Representative**

17         "[A] court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).

18   When appointing class counsel, a court must consider "(i) the work counsel has done in

19   identifying or investigating potential claims in the action; (ii) counsel's experience in handling

20   class actions, other complex litigation, and the types of claims asserted in the action;

21   (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to

22   representing the class."  Fed. R. Civ. P. 23(g)(1)(A).

23         Although plaintiff fails to specifically discuss the Rule 23(g) factors, the papers in support

24   of the instant motion provide the court with enough information to conclude that provisional

25   designate on of counsel from the Markham Law Firm is appropriate.  Plaintiff's counsel has

26

27   _____

     [6]  The other two factors for superiority (desirability of concentrating litigation in this forum, and

28   difficulty of managing the class action, Fed. R. Civ. P. 23(b)(3)(C) & (D)) do not apply when the
     action settles before class certification.  <u>See</u> <u>Mejia</u>, 2020 WL 6887749, at *6.

vigorously advanced plaintiff's position, thoroughly investigated the class members' claims, and engaged in discovery prior to mediation.  (Markham Decl. ¶¶ 8-9.)  As noted above, plaintiff's counsel has extensive experience in litigating complex class action cases, including participation in settling wage and hour class actions across the country.  (Id. ¶¶ 42-51.)  Based on counsel's previous efforts to significantly develop, litigate, and settle this case, the court anticipates that counsel will continue to devote appropriate resources to represent the class.  Thus, the court provisionally designates plaintiff's counsel as class counsel.

Additionally, the court provisionally appoints plaintiff Jorge Almanzar as class representative.  Plaintiff's interests align with those of the unnamed class members, and as discussed above, there are no conflicts of interest sufficient to render him an inappropriate class representative.  (See Almanzar Decl. ¶¶ 13-14, 18-22.)

**C.   Preliminary Approval of Proposed Settlement**

Having decided to certify the class for purposes of settlement, the court now turns to the terms of the proposed settlement agreement.  The court begins by examining whether the terms of the settlement of the class claims likely satisfy Rule 23(e).  The court then considers whether the terms of the settlement of the PAGA penalties claim are likely to be found fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals.

A settlement of a class action must be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e).  Preliminary approval is appropriate when "the court will likely be able to" give final approval.  Fed. R. Civ. P. 23(e)(1)(B).  Any fairness determination requires the court to "focus[ ] primarily upon whether the particular aspects of the decree that directly lend themselves to pursuit of self-interest by class counsel and certain members of the class—namely attorney's fees and the distribution of any relief, particularly monetary relief, among class members—strictly comport with substantive and procedural standards designed to protect the interests of class members."  Staton, 327 F.3d at 960.  Courts evaluate the "settlement as a whole, rather than assessing its individual components."  Lane v. Facebook, Inc., 696 F.3d 811, 818 (9th Cir. 2012).  Because the parties negotiated this settlement before any class was certified, the court applies a "more probing inquiry" to ensure the fairness of the proposed settlement.  Roes, 1-2 v. SFBSC

1   Mgmt., LLC, 944 F.3d 1035, 1048 (9th Cir. 2019) (quotations omitted).

2         Rule 23(e) requires the court to consider whether:

3             (A) the class representatives and class counsel have adequately represented the class;

4             (B) the proposal was negotiated at arm's length;

5             (C) the relief provided for the class is adequate, taking into account:

6                  (i)   the costs, risks, and delay of trial and appeal;

7                  (ii)  the effectiveness of any proposed method of distributing relief to the class,
    including the method of processing class-member claims;

8                  (iii) the terms of any proposed award of attorney's fees, including timing of
    payment; and

9                  (iv) any agreement required to be identified under Rule 23(e)(3); and

10            (D) the proposal treats class members equitably relative to each other.

11  Fed. R. Civ. P. 23(e).

12        ***1. Adequacy of Representation***

13        The first factor, whether "the class representatives and class counsel have adequately

14  represented the class," Fed. R. Civ. P. 23(e)(2)(A), is "redundant of the requirements of

15  Rule 23(a)(4)." Mejia, 2020 WL 6887749, at *9 (quotation omitted).  With the above-noted

16  possible exception of the amount of plaintiff's incentive award, the court preliminarily finds that

17  the adequacy factor is met for purposes of both Rule 23(e)(2)(A) and Rule 23(a)(4).

18        ***2. Arm's Length Negotiation***

19        The second factor requires the court to consider whether the proposed settlement was

20  negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B).  The settlement the parties propose is the

21  product of a formal negotiation facilitated by an experienced mediator after the exchange of

22  sufficient discovery to allow the parties to ascertain defendant's potential exposure based on

23  employee pay data.  (Markham Decl. ¶¶ 9-21.)  See Chambers v. Whirlpool Corp., 980 F.3d 645,

24  669 (9th Cir. 2020) ("The district court . . . correctly determined there was no collusion because,"

25  among other things, "the parties settled via arm's length negotiations before an experienced

26  mediator."); Fraley v. Facebook, Inc., 966 F. Supp. 2d 939, 942 (N.D. Cal. 2013) (holding that a

27  settlement reached after informed negotiations "is entitled to a degree of deference as the private

28  consensual decision of the parties").  Therefore, the court preliminary finds that this factor is

1    satisfied.

2         ### 3. *Adequacy of Relief Provided to the Class*

3         As outlined above, the adequacy determination requires consideration of four sub-factors,

4    which the court addresses in turn.  See Fed. R. Civ. P. 23(e)(2)(C)(i)-(iv).  The amount offered in

5    the proposed settlement agreement is generally the most important consideration of any class

6    settlement.  See Bayat v. Bank of the West, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015)

7    (citing In re HP Inkjet Printer Litig., 716 F.3d 1173, 1178–79 (9th Cir. 2013)).

8         Here, the parties agreed to settle this case for a non-reversionary sum of $750,000,

9    inclusive of the PAGA payments.  (Settlement Agreement § I, ¶ 17.)  After deductions for an

10   incentive award, attorney's fees, litigation costs, settlement administrator fees, and the PAGA

11   payment to the LWDA, the parties anticipate a Net Settlement Fund of $412,625.  (Id. § III, ¶ 15.)

12              i.   Costs, risks, and delay of trial and appeal

13        In determining whether the amount offered is fair and reasonable, courts compare the

14   proposed settlement to the best possible outcome for the class.  See Rodriguez v. W. Publ'g

15   Corp., 563 F.3d 948, 964 (9th Cir. 2009).  Plaintiff estimates that Home Depot's maximum

16   potential liability in this case is $8,926,428, exclusive of PAGA penalties.  (ECF No. 18.1 at 7,

17   15; Markham Decl. ¶ 21.)  Plaintiff splits this total into two categories:  direct and derivative

18   recovery.  Plaintiff estimates Home Depot's maximum exposure is $4,839,255 for his direct

19   claims:  the claims of (A) meal and rest break violations and unpaid premiums therefore,

20   (B) unpaid overtime, and (C) unreimbursed expenses for cell phones and commuting mileage.

21   (Id.)  Plaintiff then estimates another $4,087,173 in exposure for the two derivative Labor Code

22   claims, contingent on the success of the direct claims:  the claims of (D) failure to furnish

23   accurate wage statements in violation of Cal. Lab. Code § 226(a), and (E) the waiting time

24   penalties claim under Cal. Lab. Code § 203.[7]  (Id.)

25        By plaintiff's estimation, the gross settlement of $750,000 reflects 8.4% of Home Depot's

26   _____

     [7]  Plaintiff assigns no separate dollar value to his derivative UCL cause of action, and the value
27   of the PAGA penalties claim is appropriately not factored into the adequacy of the settlement of
     the class claims.
28

1    "maximum liability for all of Plaintiff's claims," i.e., $8,926,428.  (ECF No. 18.1 at 7, 15;

2    Markham Decl. ¶ 21.)  Although that math is correct, the comparison is slightly flawed.  First,

3    $750,000 reflects the gross amount that Home Depot has agreed to pay out, <u>including</u> the PAGA

4    payment of $37,500 (to be divided between the LWDA and the class members).  (Settlement

5    Agreement § III, ¶ 15.)  The $8.9 million maximum liability figure, however, <u>does not</u> include

6    Home Depot's maximum liability for PAGA penalties.[8]  (<u>See</u> ECF No. 18.1 at 12-15, calculating

7    maximum liability for each class claim, but not the PAGA claim, in reaching $8,926,428 total;

8    Markham Decl. ¶¶ 13-21, same.)  In terms of fractions, the proper numerator for analyzing the

9    adequacy of the settlement of the <u>class claims</u> is the gross settlement amount exclusive of the

10   PAGA payments, or $712,500 ($750,000 - $37,500).  Dividing this $712,500 by $8,926,428

11   yields a percentage of 8% (7.98%).

12          The court would not quibble over percentage points if this were the only issue with the

13   valuation.  However, the denominator of $8.9 million for the maximum non-PAGA liability is

14   also suspect.  Plaintiff's calculations of the "maximum exposure" for two of the direct claims—

15   the unpaid overtime claim and the cell phone expense reimbursement claim—are actually based

16   on a compromise position.  First, in calculating a "maximum exposure" of $883,508 for the

17   unpaid overtime claim, plaintiff states that "as a compromise between the parties' positions," he

18   estimates that class members averaged 15 minutes of unpaid overtime on every other shift.  (ECF

19   No. 18.1 at 13-14.)  Second, to reach the "maximum exposure" of $487,619 for unreimbursed cell

20   phone expenses, plaintiff also used a "compromise" position that each class member is entitled to

21   $20 per month to cover those expenses.  (<u>Id.</u> at 14.)  It is unsound to use a compromise position to

22   calculate a defendant's "maximum" liability on any given claim.  The court understands that

23   Home Depot disputes that any overtime went unpaid and that class members were ever required

24   to use their own cell phones for work purposes; and so, the court certainly encourages the parties

25   to use these types of compromises to arrive at a fair and adequate settlement value for the claims.

26

27   [8]      As discussed below, plaintiff estimates Home Depot's maximum PAGA liability to be an
     additional $8,051,200.  (Markham Decl. ¶ 26.)

28

However, for the court to judge the adequacy of the settlement amount, it must be presented with plaintiff's best estimate of all claims' maximum verdict value—not their post-compromised value.  Without knowing what plaintiff estimates to be the maximum (non-compromised) liability for these two direct claims, the court cannot tell how much higher than $8.9 million the maximum non-PAGA liability might climb.  Any increase, of course, will push the gross non-PAGA settlement percentage even lower than the meager 8% it currently reflects.

Class counsel asserts that this recovery is "well in range" of settlements commonly approved by California federal and state courts but cites only cases approving settlements that ranged from 9% to 35% of total potential liability.  (ECF No. 18.1 at 8, 25-26.)  In fact, 10% of the verdict value of non-PAGA claims is generally considered "the low end of reasonable recovery."  O'Connor v. Uber Techs., Inc., 201 F. Supp. 3d 1110, 1129, 1132 (N.D. Cal. 2016); see id. at 1132 n.18 (citing cases that denied approval for 6.56% and 8.82% settlements, as well as Dunleavy v. Nadler (In re Mego Fi. Corp. Sec. Litig.), 213 F.3d 454, 458–59 (9th Cir. 2000), which affirmed 16.67% settlement approval for weak and risky case).  The court will require plaintiff to better explain the reasonableness of the proposed 8% recovery for the non-PAGA claims—or whatever the true percentage turns out to be after correcting the above deficiencies.

From plaintiff's briefing, it appears that this low percentage may be because plaintiff questions the likelihood of any actual recovery for the derivative wage statements and waiting time penalties claims.  Counsel highlights that the gross settlement amount reflects 15.5% of the maximum liability for the direct claims only ($750,000 out of $4,839,255).[9]  (Markham Decl. ¶ 21.)  Counsel also avers that the gross settlement amount of $750,000 "derives primarily from (a) Plaintiff's meal and rest break claims, including allegations that premiums were paid at the incorrect rate, (b) unreimbursed business expenses, and (c) unpaid overtime claims."  (Id. ¶ 10.)  This equivocal statement of the settlement's 'primary derivation' leaves the court uncertain as to whether, in reaching the $750,000 settlement number, the parties wrote off entirely the potential value of the derivate wage statements and waiting time penalties claims.  If so, counsel should so

---

[9]  Again, this should exclude the PAGA payout, so the proper math is really $712,500 / $4,839,255, or 14.7%.

1   state.

2        The court also recognizes that, in light of a recent decision by the California Supreme

3   Court, the parties' calculus in omitting or heavily discounting these derivative Labor Code claims

4   may have changed since the filing of this motion back in October 2021.  On May 23, 2022, the

5   California Supreme Court issued an opinion in Naranjo v. Spectrum Sec. Servs., Inc., 13 Cal. 5th

6   93 (2022), holding that (1) premium pay for meal and rest break violations constitutes "wages"

7   for purposes of Labor Code § 203 waiting time penalties claims, and (2) an employer's obligation

8   under Labor Code § 226 to report wages earned includes an obligation to report premium pay for

9   missed breaks.  Id. at 117, 121.  The state supreme court thereby reversed the portion of the Court

10  of Appeal's prior judgment that "the failure to timely pay or report section 226.7 premium pay

11  can never support relief under Labor Code sections 203 and 226."  Id. at 126; see Naranjo v.

12  Spectrum Sec. Servs., Inc., 40 Cal. App. 5th 444 (2d Dist. 2019).

13       Plaintiff's moving papers cite the Court of Appeal's adverse 2019 Naranjo decision as a

14  likely defense that Home Depot would raise to avoid liability for the § 203 and § 226 derivative

15  class claims asserted here.  (ECF No. 18.1 at 29; Markham Decl. ¶ 41.)  Plaintiff also cites

16  another Court of Appeal decision in support of this expected defense:  Maldonado v. Epsilon

17  Plastics, Inc., 22 Cal. App. 5th 1308 (2d Dist. 2018), which denied recovery for a § 226 wage

18  statements claim because the plaintiffs could not show injury by the wage statement inaccuracies

19  under § 226's specific definition of "injury."  Id. at 1334-37; see Cal. Lab. Code § 226(e).

20       The California Supreme Court's decision in Naranjo eliminates the anticipated defense

21  that, as a matter of law, non-payment of meal and rest break premiums cannot form the basis of

22  derivative claims under § 203 or § 226.  13 Cal. 5th at 126.  The contrary portion of the 2019

23  Court of Appeal decision in Naranjo is no longer good law, and the California Supreme Court's

24  recent decision expressly recognizes that Maldonado never supported that interpretation in the

25  first place.  See Naranjo, 13 Cal. 5th at 119-20 (rejecting defendant's reliance on Maldonado

26  because that decision recognized "'[w]age statements should include the hours worked at each

27  rate and the wages earned' — not just wages actually paid" (quoting Maldonado, 22 Cal. App. 5th

28  at 1336) (emphases original)).  The state supreme court went on to hold that a failure to report on

21

a wage statement both the additional hour of work credited for a missed break and the

corresponding premium pay owed constitutes injury within the meaning of § 226(e)(2)(B).

Naranjo, 13 Cal. 5th at 120.  Thus, it appears that plaintiff now also potentially may have little

trouble proving injury for purposes of the § 226 wage statements claim.

Even so, there may be other obstacles to success on these derivative claims.  The most

prominent risk, of course, is that plaintiff could only succeed on these derivative claims if he can

prove underlying violations of the overtime and meal and rest break premium laws asserted in his

direct claims.  In addition, both § 203 and § 226 require a showing of bad faith by the employer.

See Cal. Lab. Code § 203 (authorizing penalty if "an employer willfully fails to pay" full amounts

due at separation); Cal. Lab. Code § 226(e)(1) (authorizing wage statement penalties only for

employees who suffer injury "as a result of a knowing and intentional failure by an employer" to

provide an accurate wage statement).  This may pose significant problems of proof and litigation

expense that the parties continue to factor into the gross settlement amount.

Any renewed motion for preliminary approval should clarify the valuation of the

settlement of these derivative claims and how they factor into the gross settlement amount, taking

into account the California Supreme Court's decision in Naranjo.

In addition, whether or not the derivative claims factor in the gross settlement amount,

plaintiff must also better explain how the parties got from $8.9 million (or $4.8 million for the

direct claims) down to $712,500 for the non-PAGA settlement amount.  Simply stating that the

gross settlement "derives primarily" from the four direct claims and that, of these, the under-paid

meal break premium and unreimbursed business expense claims are the "strongest" is not enough.

(See Markham Decl. ¶¶ 10, 21.)

The court tends to agree with counsel's assessment of the significant difficulties and

expense that would arise in attempting to litigate the direct claims.  (See ECF No. 18.1 at 26-29.)

Particularly problematic for plaintiff are the following acknowledged circumstances:  that Home

Depot's time-rounding policy was neutral (making it equally susceptible to adding overtime, as

opposed to subtracting it); that Home Depot had a legally-compliant policy of allowing class

members to take meal breaks; that Home Depot had an automatic-payment policy for premiums

to compensate for missed breaks and actually paid $1.2 million in meal break premiums during the class period; that there are no recorded or retained records of when employees took rest breaks or when rest breaks were interrupted; that Home Depot has a policy prohibiting cell phone use and provides alternatives that make cell phone use unnecessary for work purposes; and that class members did not submit requests for reimbursement of personal cell phone expenses.  (Id.)

However, the current briefing still leaves the court to guess which of the direct claims actually factored into the $712,500 non-PAGA settlement figure, and at how much of a discount based on anticipated risks and defenses.  Plaintiff need not explain the settlement valuation in granular detail, but the court requires better linkage between the problems or risks noted for the various direct claims and the resulting gross settlement amount.  This is not to say that the court will not preliminarily approve a proposed settlement that is a small fraction of the maximum verdict value of the non-PAGA claims.  The court simply requires a better explanation of the reasonableness of so doing.

Because the court cannot, on the current motion, determine whether the proposed settlement amount is likely reasonable, the court denies preliminary approval of the settlement.  **Any renewed motion for preliminary approval of the settlement shall (1) include the true maximum liability estimated for each class claim; (2) calculate the percentage of settlement recovery on the class (non-PAGA) claims based on the maximum liability for all class (non-PAGA) claims; and (3) clarify the reason for omitting the value of derivative wage statements and waiting time penalties claims, if they are indeed being omitted.**

Because the court finds defects or potential issues in other aspects of the settlement as well, the court continues the preliminary approval analysis below.

ii.  <u>Effectiveness of proposed method of distributing relief</u>

Under the Settlement Agreement, class members will not have to submit claims to receive payment.  (Settlement Agreement § III ¶¶ 15, 18.)  Instead, class members will be identified through defendant's employment records; the settlement administrator will search for class members' most recent address through the National Change of Address Database and by skip tracing; and class members will receive the settlement payment by mail unless they opt out of the

settlement.  (Id. § III ¶¶ 6, 7, 11, 16, 24.)  Each class member's share will be calculated based on how many workweeks they worked during the class period, which can be readily determined by defendant's employment records and will be stated on the Class Notice; and class members will have an opportunity to challenge errors relating to their dates of employment.  (Id. § I ¶¶ 9, 18, 26; id. § III ¶¶ 9, 16, 17; ECF No. 18.1 at 11.)  Checks will then be mailed to each participating class member.  (Id. § III ¶¶ 16, 18-19.)  The court finds this method of distributing relief "simple and effective."  Loreto v. Gen. Dynamics Info. Tech., Inc., 2021 WL 1839989, at *10 (S.D. Cal. May 7, 2021).  Although the court discusses below multiple necessary changes to the content of the Class Notice, the overall distribution scheme appears acceptable.

     iii. Terms of proposed award of attorney's fees

   The Settlement Agreement provides that class counsel will request attorney's fees up to 33.33% percent (one-third) of the gross settlement amount, currently anticipated to be $250,000 in fees.  (Settlement Agreement § III, ¶ 22.)

   In settlements such as this one that produce a common fund, courts may use either the lodestar method or percentage-of-recovery method to determine the reasonableness of attorney's fees.  In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 942 (9th Cir. 2011).  Under the percentage method, "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award."  Id.  However, a departure may be justified based on "special circumstances."  Id.

   Given that class counsel eventually will move separately for attorney's fees and costs under Rule 23(h), the court need not determine at the preliminary approval stage whether a 33% award is reasonable.  The court is inclined to find that the proposed attorney's fees award is not so disproportionate to the relief provided to the class that it "calls into question the fairness of the proposed settlement."  Pokorny v. Quixtar Inc., 2011 WL 2912864, at *1 (N.D. Cal. July 20, 2011).

   In the forthcoming Rule 23(h) motion, class counsel will be expected to fully substantiate the justification for an attorney's fees award—especially a request exceeding the 25% benchmark—addressing factors such as "(1) whether the results achieved were exceptional;

24

(2) risks of litigation; (3) non-monetary benefits conferred by the litigation; (4) customary fees for similar cases; (5) the contingent nature of the fee and financial burden carried by counsel; and (6) the lawyer's reasonable expectations, which are based on the circumstances of the case and the range of fee awards out of common funds of comparable size." <u>Mejia</u>, 2020 WL 6887749, at *10 (quotation omitted).  Class counsel's plan to brief the fee application using the lodestar method as a cross-check will also assist the court in confirming the reasonableness of the requested fees.[10]  (ECF No. 18.1 at 15.)

In any renewed motion for preliminary approval, class counsel is welcome to adjust the proposed amount of attorney's fees or provide further explanation for awarding fees above the typical 25% benchmark.  However, further justification is not necessary for purposes of preliminary approval of the settlement as any fees will be closely scrutinized as part of any future Rule 23(h) motion.

### iv. <u>Agreements made in connection with the proposal</u>

Plaintiff identifies no other agreements made in connection with the proposed settlement. <u>See</u> Fed. R. Civ. P. 23(e)(2)(C), (e)(3).  Therefore, this final sub-factor appears to weigh in favor of approving the settlement.

### 4. *Equitable Treatment of Class Members*

The fourth factor addresses whether the proposed settlement agreement "treats class members equitably relative to each other."  <u>See</u> Fed. R. Civ. P. 23(e)(2)(D).  This inquiry considers both (i) equity across sub-categories, or segments, of the class, and (ii) equity between class representatives and unnamed class members.

The Settlement Agreement does not overtly discriminate between any segments of the class, as it distributes monetary relief to all class members based on the number of compensable workweeks they worked for Home Depot.  (Settlement Agreement § I, ¶¶ 9, 18, 26; <u>id.</u> § III ¶¶ 16, 17; ECF No. 18.1 at 11.)   As summarized by counsel, and supported by the current

---

[10]   The Settlement Agreement is not contingent upon the court awarding any particular amount of attorney's fees, and any requested amount not granted by the court will return to the common fund for distribution to participating class members.  Settlement Agreement § III, ¶ 22.

Settlement Agreement, the following formula determines the individual payments:  [Workweeks worked by class member / Total Workweeks worked by all class members] X [Net Settlement Amount] = Class Member's Payment.  (ECF No. 18.1 at 11.)

The court is concerned that distributing payments exclusively via this single formula may result in two latent inequities between class members.  First, this creates possible inequity between class members who remained employed by Home Depot through the end of the class period, on the one hand, and class members who separated from Home Depot during the class period, on the other.  Only those who left Home Depot during the class period could bring waiting time penalty claims under Labor Code § 203, since those claims are triggered by separation from employment.  However, the settlement distribution scheme does not distinguish between current and former employees.  To the extent the net settlement amount is based on liability for waiting time penalties, therefore, the separated employees will be sharing their recovery with non-terminated employees who would have no basis to bring a waiting time penalty claim of their own.  As explained above, it is currently unclear whether the settlement amount is based on the value of any waiting time penalties claim.  If so, any renewed motion for preliminary approval should explain why this differential treatment is not impermissibly inequitable.

Second, the use of the above formula will not allow for class members to recover amounts proportional to (i) the amount of time they actually worked within the given workweeks, or (ii) their hourly rate of pay.  For example, a class member who worked 45 hours each week for 7 workweeks at a rate of $15 per hour will receive the same settlement payment as a class member who worked 15 hours each week for 7 workweeks at a rate of $13 per hour (which also hypothetically raises questions of over-compensating any class members who did not work enough hours to bring their own overtime claims).  See Ceja-Corona v. CVS Pharmacy, Inc., 2014 WL 4472691, at *9 (E.D. Cal. Sept. 11, 2014) (ordering amended motion for preliminary approval to address same issues arising from use of formula identical to the instant one).  Because the current motion does not describe the range of hours worked by any individual class members or the range of hourly pay-rates, the court cannot determine how disparate the resulting individual payments might be.  Any renewed motion for preliminary approval should provide this

1  information and explain why a nonproportional distribution scheme is not impermissibly

2  inequitable.

3       As to equitable treatment between the class representative and the unnamed class

4  members, the court incorporates its above discussion regarding the comparatively high incentive

5  award currently provided for Mr. Almanzar.  Given that the court retains discretion to award a

6  lower amount to Mr. Almanzar depending on the justification provided in a future Rule 23(h)

7  motion, the court is not inclined to find this a source of impermissible inequity.

8       For the above reasons, the court declines to preliminarily approve the Settlement

9  Agreement as to the class claims under Rule 23(e).  Finally, the court turns to the adequacy of the

10  Settlement Agreement with respect to the settlement of the PAGA claim.

11       ***5.  Settlement of PAGA Penalties Claim***

12       The SAC's Eighth Cause of Action asserts a claim for PAGA penalties, on behalf of

13  plaintiff and all aggrieved employees, for the Labor Code violations asserted in the preceding

14  class claims.  (SAC at 21-22.)  As discussed at the outset, PAGA claims and their settlement are

15  fundamentally distinct from the class claims discussed above.  See Hamilton, --- F.4th ---, 2022

16  WL 2350262, at *5 ("Rule 23 class actions and PAGA actions are so conceptually distinct that

17  class action precepts generally have little salience for PAGA actions."); Canela, 971 F.3d at 852

18  (noting "the different remedial schemes that exist in Rule 23 class actions and PAGA suits").  As

19  explained below, the current Settlement Agreement does not adequately account for the distinct

20  nature and effect of the class claims versus the PAGA claim.

21       Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor

22  code violations on behalf of himself and other current or former employees.  Cal. Lab. Code

23  § 2699(a).  Indeed, "[p]laintiffs may bring a PAGA claim only as the state's designated proxy,

24  suing on behalf of all affected employees."  Kim, 9 Cal. 5th at 87.  Because a PAGA plaintiff

25  serves "as the proxy or agent of the state's labor law enforcement agencies," "a judgment in th[e]

26  action binds all those, including nonparty aggrieved employees, who would be bound by a

27  judgment in an action brought by the government."  Arias v. Superior Ct., 46 Cal. 4th 969, 986

28  (2009).  "Unlike a class action, there is no mechanism for opting out of a judgment entered on a

1   PAGA claim." <u>Amaro v. Anaheim Arena Mgmt., LLC</u>, 69 Cal. App. 5th 521, 541 n.5 (4th Dist.

2   2021) (cleaned up).  Thus, a PAGA plaintiff owes a duty both to their "fellow aggrieved

3   workers," who will be inalterably bound by the judgment on the PAGA claim, and to the public at

4   large because "they act, as the statute's name suggests, as a private attorney general." <u>O'Connor</u>,

5   201 F. Supp. 3d at 1133–34.  Under PAGA's remedial scheme, civil penalties recovered are

6   distributed between "the aggrieved employees" (25%) and the LWDA (75%).  Cal. Lab. Code

7   § 2699(i).  Any settlement of PAGA claims must be approved by the court; and the proposed

8   settlement must also be sent to the LWDA at the same time it is submitted to the court.[11]  Cal.

9   Lab. Code § 2699(*l*)(2).

10      Although the court does not evaluate the settlement of PAGA claims under the Rule 23

11   criteria, it must still inquire into the fairness of the PAGA settlement.  "[I]n reviewing a

12   settlement that includes both a Rule 23 class and a PAGA claim, the Court must closely examine

13   <u>both</u> aspects of the settlement." <u>O'Connor</u>, 201 F. Supp. 3d at 1133.  Based on the best guidance

14   at hand—from the LWDA's input in <u>O'Connor</u>, in the absence of a definitive governing

15   standard—district courts typically apply "a Rule 23-like standard" asking whether the settlement

16   of the PAGA claims is "fundamentally fair, reasonable, and adequate." <u>Haralson v. U.S. Aviation</u>

17   <u>Servs. Corp.</u>, 383 F. Supp. 3d 959, 972 (N.D. Cal. 2019); see <u>Mondrian v. Trius Trucking, Inc.</u>,

18   2022 WL 2306963, at *7 (E.D. Cal. June 27, 2022) (noting lack of binding standard for approving

19   PAGA settlements and adopting "fundamentally fair, reasonable, and adequate" standard based

20   on LWDA's <u>O'Connor</u> commentary).

21          i.   <u>Fundamental Fairness of Settlement of PAGA Claims</u>

22      "While a proposed settlement must be viewed as a whole, [citation omitted] the Court

23   must evaluate the adequacy of compensation to the class as well as the adequacy of the settlement

24   in view of the purposes and policies of PAGA.  In doing so, the court may apply a sliding scale."

25   <u>O'Connor</u>, 201 F. Supp. 3d at 1134.  "For example, if the settlement for the Rule 23 class is

26   robust, the purposes of PAGA may be concurrently fulfilled." <u>Id.</u>  Non-monetary relief provided

27

---

28   [11]  Class counsel avers that this was done, attaching a confirmation message from the LWDA.
    (Markham Decl. ¶ 53, Ex. 2.)

1    through the settlement may also satisfy PAGA's interests in enforcement and deterrence.  Id. at

2    1134-35.  However, in a case like this one (currently) where a settlement provides "relatively

3    modest" amounts in settlement of the class claims compared to their verdict value, and there is no

4    non-monetary relief provided, the PAGA aspect of the settlement must stand on its own to

5    "substantially vindicate" PAGA's policy interests.  Id. at 1135.

6         The Settlement Agreement provides for $37,500 in PAGA penalties, out of the gross

7    settlement amount of $750,000.  (§ III, ¶ 15.)  Class counsel estimates that the maximum PAGA

8    penalties plaintiff could recover at trial for the direct claims only is $8,051,200.  (Markham Decl.

9    ¶ 26, based on 20,128 (PAGA-covered pay periods) X 4 (one violation of each of the four types

10   [overtime, meal breaks, rest breaks, reimbursement] in each pay period) X $100 (statutory

11   penalty).  Based on these numbers, the recovery for PAGA penalties would be 5% of the gross

12   settlement amount, and roughly 0.5% of Home Depot's maximum PAGA liability stemming from

13   the direct claims.

14        The court will defer deciding the fairness of the PAGA settlement amount for now

15   because the recent Naranjo decision (discussed above) also calls into question class counsel's

16   decision to estimate the maximum PAGA liability without reliance on the derivative wage

17   statements and waiting time penalty claims.  Counsel helpfully alerts the court that the present

18   PAGA penalties exposure estimate does not include penalties based on the derivative claims

19   because of the state appellate court decisions in Maldonado, 22 Cal. App. 5th 1308, and Naranjo,

20   40 Cal. App. 5th 444, which were good law at the time plaintiff filed this motion for preliminary

21   approval.  (Markham Decl. ¶ 28.)  As explained above, the California Supreme Court's May 23,

22   2022 decision in Naranjo, 13 Cal. 5th 93, eliminates Maldonado and Naranjo as obstacles to

23   success on derivative § 203 and § 226 claims arising from non-payment of meal and rest break

24   premiums.  This change in the law would appear to make it unreasonable to omit penalties based

25   on derivative claims from the calculation of Home Depot's maximum PAGA exposure—for

26   purposes of determining the fairness of the $37,500 PAGA settlement amount.  Because the

27   current motion does not indicate what additional amount of PAGA penalties Home Depot would

28   face for the derivative claims, the court will withhold judgment on the PAGA settlement's

1    fairness until that amount is provided in any renewed motion for preliminary approval.

2         Should the parties disagree with the court's view of this change in the law, or have other

3    reasons for believing that Home Depot would face no PAGA penalties arising from the derivative

4    claims, counsel may explain that reasoning in any renewed motion.  In addition, any renewed

5    motion shall advise whether the LWDA has objected or otherwise responded to the proposed

6    settlement.  See Rodriguez v. Danell Custom Harvesting, LLC, 293 F. Supp. 3d 1117, 1133 (E.D.

7    Cal. 2018) (approving 0.6% PAGA payment because LWDA did not object to terms of

8    settlement); Mancini v. W. & S. Life Ins. Co., 2018 WL 4489590, at *2 (S.D. Cal. Sept. 18, 2018)

9    (taking LWDA's "acquiescence as indication that the settlement is presumptively reasonable").

10             ii.   Distribution of PAGA Payment & Inability to Opt Out of PAGA Settlement

11        Finally, even if the court could find the PAGA settlement reasonable from a monetary

12   standpoint on this motion, the settlement currently proposed still is not fair in terms of its

13   distribution mechanism for the non-LWDA portion of the PAGA payment.

14        It is uniformly acknowledged that, "[u]nlike Rule 23(c)(2), PAGA has no notice

15   requirements for unnamed aggrieved employees, nor may such employees opt out of a PAGA

16   action." Sakkab v. Luxottica Retail N. Am., Inc., 803 F.3d 425, 436 (9th Cir. 2015) (quotation

17   omitted); see Amaro, 69 Cal. App. 5th at 541 n.5 ("Unlike a class action, there is no mechanism

18   for opting out of a judgment entered on a PAGA claim." (cleaned up)); Rutter, Cal. Prac. Guide

19   Civ. Pro. Before Trial Ch. 14-C [14:134.1] ("There is no mechanism by which an aggrieved

20   employee can 'opt out' of a PAGA claim." (citation omitted)).

21        "Because a PAGA plaintiff acts as a proxy for the state and brings an enforcement action

22   on behalf of all aggrieved employees, claim preclusion will bar relitigation of PAGA claims by

23   any person, even one who has purported to 'opt out.'"  Rutter [14:134.1] (citing Robinson v.

24   Southern Counties Oil Co., 53 Cal. App. 5th 476, 482-84 (1st Dist. 2020), which held that an

25   employee who opted out of class settlement of individual claims in prior class-and-PAGA action

26   was precluded from pursuing civil penalties for same PAGA violations because the prior

27   judgment finally resolved the LWDA's claims for those violations); see Arias, 46 Cal. 4th at 986

28   ("[A] judgment in [the PAGA] action binds all those, including nonparty aggrieved employees,

30

1    who would be bound by a judgment in an action brought by the government.").

2           The present Settlement Agreement fails to account for this fundamental difference

3    between the class versus PAGA claims it covers.  Despite acknowledging the existence of the

4    PAGA claim, the Settlement Agreement (1) frames requests for exclusion ("opt-outs") as being

5    effective for all claims, and (2) totally excludes from any recovery all class members who opt out.

6    Both strike the court as improper.

7           Of course, "[a] defining feature of the class action procedure is that a class member may

8    opt out of the class if he or she does not wish to be bound by the result of the suit."  Uribe v.

9    Crown Bldg. Maint. Co., 70 Cal. App. 5th 986, 1001 (4th Dist. 2021), as modified on denial of

10   reh'g (Oct. 26, 2021) (cleaned up).  "PAGA actions do not afford the same opt out feature."  Id.

11          Both the current Settlement Agreement and the proposed Class Notice, however, make it

12   seem as though opting out of the class means opting out of the PAGA representative action as

13   well.  For instance, the Settlement Agreement provides:  "Any Settlement Class Member who

14   requests to be excluded from the Settlement Class [(1)] will not be entitled to any recovery under

15   the Settlement and [(2)] will not be bound by the terms of the Settlement or have any right to

16   object, appeal, or comment thereon."  (Settlement Agreement § III, ¶ 11.)  While these assertions

17   are true with respect to the class claims, they are both incorrect with respect to the PAGA claims.

18          Starting with assertion (2), as just discussed, judgment on a PAGA claim does in fact bind

19   all aggrieved employees who experienced the violation in question.  See Arias, 46 Cal. 4th at 986;

20   Robinson, 53 Cal. App. 5th at 482-84; Cal. Lab. Code § 2699(c) ("'aggrieved employee' means

21   any person who was employed by the alleged violator and against whom one or more of the

22   alleged violations was committed").  Therefore, the settlement of the PAGA claim included in the

23   Settlement Agreement would prohibit any other Night Team MEA from bringing a PAGA claim

24   (or obtaining relief through another PAGA representative suit) based on overtime, meal- and rest-

25   break premium, reimbursement, wage statements, and waiting time penalty violations arising

26   from the PAGA-covered period in this action, even if that person opts out of the Settlement

27   Agreement.  See O'Connor, 201 F. Supp. 3d at 1120.

28          As for assertion (1), although less clearly established in case law, the court deems it also

incorrect to say that anyone who opts out will not be entitled to "any recovery under the Settlement."  (Settlement Agreement § III, ¶ 11.)  True, anyone who opts out will not be entitled to any recovery for the class claims under the Settlement; but they should still be compensated for their portion of the 25% PAGA payment designated for aggrieved employees.  If they are to be bound by the judgment on the PAGA claim, given the impossibility of opting out of that claim, at least they should receive their share of the recovery for the adjudged PAGA claim.

According to the California Supreme Court, "a portion of the [PAGA] penalty goes not only to the citizen bringing the suit but to all employees affected by the Labor Code violation." Iskanian v. CLS Transportation Los Angeles, LLC, 59 Cal. 4th 348, 382 (2014) (emphasis added), abrogated on other grounds by Viking River Cruises, Inc. v. Moriana, 142 S. Ct. 1906 (2022).  The Ninth Circuit agrees, stating the 25% PAGA allocation for employees "is not awarded exclusively to the employee who files the suit.  Instead, it is allocated among the aggrieved employees." Canela, 971 F.3d at 852 n.3; see Martinez Lopez v. Randstad US, L.P., 822 F. App'x 518, 519 (9th Cir. 2020) ("That 25 percent is distributed among all aggrieved employees, not just the named PAGA representatives.") (citing Moorer v. Noble L.A. Events, Inc., 32 Cal. App. 5th 736, 741–43 (2d Dist. 2019), which in turn includes a heading that "PAGA Civil Penalties Must Be Distributed to All Aggrieved Employees").

The court acknowledges that the representative plaintiff here is by no means trying to claim all of the 25% PAGA payment for himself, as was the case in Martinez Lopez and Moorer. However, the above statements of law apply with equal force to require rejecting a proposal, such as this one, to preclude PAGA recovery for those aggrieved employees who might opt out of the settlement of their class claims.  The above references to "all" aggrieved employees mean "all," including those who may opt out of settling non-PAGA claims within the same action.  This view is reinforced by PAGA's text, which provides that "[c]ivil penalties recovered by aggrieved employees shall be distributed as follows:  75 percent to the . . . Agency . . . and 25 percent to the aggrieved employees," without qualification.  Cal. Lab. Code § 2699(i) (emphasis added).  Class members who opt out of the settlement of their class claims are still "aggrieved employees," nonetheless, and are therefore still entitled to a share of the 25% PAGA payment recovery.

Upon the filing of a PAGA claim, all aggrieved employees have "an inchoate interest in [the] litigation proceeds" from those claims, which fully materializes once the representative plaintiff prevails. Viking River Cruises, 142 S. Ct. at 1920-21 (citing Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 773 (2000), for the proposition that "[t]he 'right' to a share of the proceeds of a qui tam action 'does not [ ] fully materialize until the litigation is completed and the relator prevails"). By settling the instant PAGA claim, the representative plaintiff (or relator, in the language of qui tam) will have prevailed. It follows, then, that all aggrieved employees are entitled to a share of the proceeds of the PAGA settlement, regardless of whether they opt out of the class settlement.

The proposed Class Notice repeats and compounds the errors in the Settlement Agreement, stating "If you ask to be excluded, you will not receive a share of the settlement proceeds, but you keep any rights you may have to bring your own suit against Defendant for the same legal claims in this lawsuit." (ECF No. 18.2 at 51, lines 20-22; see id. at 54, stating those who opt out "will not receive any payment as part of this settlement. Such persons will keep any rights to sue Defendant separately about the claims made in this lawsuit.") Again, these statements are incorrect with respect to the PAGA claim. Submitting a Request for Exclusion will not preserve any class member's right to bring their own PAGA claim for the alleged violations in a future suit. And even those who opt out will still receive a share of the 25% PAGA payment, based on the court's above reading of the law.

The undersigned acknowledges that some courts have approved without comment settlement agreements that similarly fail to account for these distinctions between PAGA and class mechanisms. See, e.g., Mejia, 2020 WL 6887749, at *9 (preliminarily approving settlement where PAGA penalties were to be "distributed evenly among class members who do not opt out"); Sherman v. CLP Res., Inc., 2020 WL 2790098, at *2 (C.D. Cal. Jan. 30, 2020) (approving settlement with PAGA penalties to be "paid to participating class members"). However, by far the better practice is to recognize the distinctions and treat the two sets of claims separately within the settlement process. "[A] single settlement of PAGA and class claims should consist of two separate payments and releases. One for the PAGA claims, from which aggrieved employees

cannot opt out, and the other for the class claims, from which class members can opt out."
Amaro, 69 Cal. App. 5th at 541 n.5.  Although dicta, this recommendation now appears in well-reputed practice guides.  See Rutter, Cal. Prac. Guide Civ. Pro. Before Trial Ch. 14-C [14:134.1] ("PAGA and class settlements 'should consist of two separate payments and releases.'" (quoting Amaro)).  And for good reason:  this separate treatment reflects the critical differences between PAGA representative actions brought on behalf of the government and Rule 23 class actions brought as a collection of individual private claims.  It also ensures that even class members who opt out of the class settlement will be able to receive their portion of the PAGA payment (over which they have virtually no control[12]).

The court leaves it to the parties to determine how best to revise the settlement to ensure that both (1) the agreement and the class notice accurately convey how opting out will affect class members' rights under the law, and (2) all aggrieved employees for purposes of the PAGA claim receive their pro rata portion of the 25% PAGA payment designated for them, regardless of whether they opt out of the class settlement.  For examples, the parties might look to the settlement agreements approved in Loreto v. Gen. Dynamics Info. Tech., Inc., 2021 WL 1839989, at *2 (S.D. Cal. May 7, 2021) ("PAGA members would be mailed the PAGA payment even if they opt-out of the class settlement."); Stonehocker v. Kindred Healthcare Operating LLC, 2021 WL 1643226, at *24 (N.D. Cal. Apr. 27, 2021) (distinguishing between Class Members and PAGA Releasees, and making explicit that PAGA Releasees "will not have the opportunity to opt out or object to the PAGA Payment and/or release of PAGA Claims although the PAGA Settlement will be subject to Court approval"); and Chalian v. CVS Pharmacy, Inc., 2021 WL 3015407, at *9 (C.D. Cal. July 16, 2021) (creating separate PAGA-only fund from net settlement amount).   But no particular form of separate treatment is required.

///

---

[12]   See Chris Micheli, *Private Attorneys General Act Lawsuits in California: A Review of PAGA and Proposals for Reforming the "Sue Your Boss" Law*, 49 U. Pac. L. Rev 265, 280 (2018) (noting that "because there is no class action 'opt-out' procedure by which other employees decide whether they want to be bound by the outcome, a PAGA plaintiff can settle his or her case and bind other 'aggrieved employees' without bothering to give them a say").

As best the court can tell from the current motion, all persons who would qualify as aggrieved employees for purposes of the PAGA claim are also class members eligible to receive individual class settlement payments; however, the reverse is not true.  Counsel estimates 1,992 class members but only 961 "PAGA Settlement Members during the PAGA Period."  (Markham Decl. ¶ 26.)  Despite the capitalization, neither "PAGA Settlement Members" nor the "PAGA Period" are defined in the Settlement Agreement.  It appears that the "PAGA Period" is significantly shorter than the Class Period, given that counsel estimates 20,128 pay periods for PAGA purposes, versus 50,751 pay periods in the class period.  (Id. ¶¶ 11, 26.)  Any renewed motion for preliminary approval must also clarify the "PAGA Period" and what measures will be taken to ensure that "PAGA Settlement Members" and Class Members are accurately apprised of their rights to payment, what claims they are releasing, and the effect of their decision opt out.

For these reasons, the court denies without prejudice the motion to approve the proposed settlement of the PAGA claims.

**D. Issues with the Proposed Class Notice**

Even though the court is not yet preliminarily approving the proposed settlement, it is worth taking this opportunity to address two other issues with the proposed Class Notice in hopes of smoothing the path to settlement approval following any renewed motion.

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1); see Hanlon, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e).").  A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  Churchill Vill., LLC v. Gen. Elec., 561 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citations omitted).

In addition to the errors noted in the preceding section, there are two other issues that must be corrected in any revised class notice submitted for this settlement.  The court raises these issues to ensure that class members (1) understand they have the option to dispute the number of workweeks being credited to them, and (2) have enough information to reasonably identify and

1  object to any discrepancies.

2        First, the summary chart of "options available to you" should include a fourth option

3  beyond the current (1) Do Nothing; (2) Ask to be Excluded (Opt Out); or (3) Object.  (See ECF

4  No. 18.2 at 51, lines 16-23.)  As reflected in the Settlement Agreement (§ I, ¶ 32), there is also a

5  fourth option to "dispute the information contained in the Notice of Class Action Settlement,"

6  referring to the number of workweeks worked during the class period.  Under the current

7  distribution formula, that number of workweeks will determine the amount of the individual

8  payment a participating class member receives on the class claims.  This option therefore should

9  also be reflected prominently on a fourth row of the summary chart of response options.

10        As a corollary, the bolded text below the chart should be amended accordingly to read:

11  **"To opt out, object, or dispute your employment dates, you must act by _____."**  (See ECF

12  No. 18.2 at 51, lines 24-25, which currently refers only to a deadline to "opt out or object.")

13        Second, the class notice should be revised to list not just the total number of workweeks

14  worked during the class period but also the recipient's actual dates of employment as shown on

15  Home Depot's records.  Currently, the Class Notice only provides a space where the total number

16  of credited workweeks will be listed, alongside the estimated individual settlement payment and

17  an explanation of how to dispute the number of workweeks.  (ECF No. 18.2 at 52 line 28 to 53

18  line 2.)  This does not align with the Settlement Agreement (§ III, ¶ 9), which states that class

19  members "will have the opportunity, should they disagree with Defendant's records regarding the

20  dates of employment stated on their Notice of Class Action Settlement," to dispute those dates.

21  Id. (emphasis added).  Without knowing what actual dates were used to calculate the total number

22  of workweeks being attributed to them, it is unreasonable to expect class members to be able to

23  dispute that total based on their own records and recollections.

24        Any renewed motion for preliminary approval shall be accompanied by a proposed notice

25  of class action settlement that incorporates these changes, or the motion shall otherwise explain

26  why these changes are not feasible.

27  ///

28  ///

## ORDER

For the above reasons, it is HEREBY ORDERED that:

1.  Plaintiff's motion for provisional class certification and preliminary approval of settlement (ECF No. 18) is GRANTED IN PART and DENIED IN PART as follows.

2.  Plaintiff's request for a ruling on the above motion (ECF No. 21) is DENIED as moot.

3.  The court GRANTS provisional certification, for settlement purposes only, of the following settlement class as set forth in the proposed settlement agreement (ECF No. 18.2 at 24):

    a.  All current and former non-exempt, hourly Night Team Merchandising Execution Associates who worked for Home Depot in California between April 3, 2016 and November 1, 2021.

4.  Plaintiff's counsel, The Markham Law Firm, is appointed as class counsel for settlement purposes;

5.  The named plaintiff, Jorge Almanzar, is appointed as class representative for settlement purposes;

6.  The court DENIES without prejudice preliminary approval of the settlement; and

7.  Plaintiff is granted leave to amend the Settlement Agreement to address the court's concerns.

Dated:  July 18, 2022

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

alma.699

37